HARRIS *et ux.* *v.* WEBSTER *et ux.*

In an action for the slander of one married woman by another, the husband of neither party can be joined as plaintiff or defendant.

CASE, for slanderous words spoken of Mrs. Harris by Mrs. Webster. The defendants demurred.

*Putnam* and *Bingham & Mitchell*, for the plaintiffs.

*Carpenter*, for the defendants.

FOSTER, J.   By the doctrine of the English common law, husband and wife have always been required to sue jointly for injuries to the person or character of the wife, committed during coverture. Dicey on Parties 389 ; 1 Ch. Pl. 73.   The wrongful act—for example, an assault upon the wife—may involve two distinct wrongs, and afford two distinct causes of action.   The first is the assault upon the wife ; and the second is the damage occasioned thereby (through loss of service) to the husband.   The husband cannot sue alone merely for the injury done to the wife, but he may sue alone for the damage occasioned thereby to himself.   In like manner, at common law, in an action for the slander of the wife, if the words are actionable *per se*, the husband and wife must join in a suit for the direct injury to her *(Dengate* v. *Gardiner*, 4 M. & W. 5), but the husband must sue alone for consequential damage to him ; and so, also, if the words are not actionable in themselves, but only because they cause damage to the husband, he must sue alone : the wife cannot join.   Dicey on Parties 391, 392. So, also, at common law, husband and wife must be sued jointly for all torts committed by the wife during coverture, unless the tort be committed in the presence and by the direction of the husband, in which case he alone is liable.   Dicey on Parties 476 ; 1 Starkie on Slander 349 ; 1 Ch. Pl. 93 ; *Carleton* v. *Hayward*, 49 N. H. 314.

At common law the wife alone can neither sue nor be sued.   The reason of this is founded upon the general doctrine of conjugal union expressed by "the father of the English common law," in the emphatic and sacred phrase, "Man and wife are the same flesh." *Sunt idem corpus et eadem caro, vir et uxor.*   Bracton, f. 31.   *Sunt quasi unica persona, quis caro una et sanguis unus.*   Bracton, f. 430.   And herein, says an old writer, "The common law shaketh hands with divinitie"—an illustration of the habit of presenting every established fact which is too bad to admit of any other defence, as an injunction of religion.   Mill on the Subjection of Women 84.   All persons are either free or serfs.   Also, some are under the rod *(sub virga)*, as wives, &c.   Bracton, f. 46.

" By marriage, husband and wife become one person in law ; that is,

the very being or legal existence of the wife is suspended during the marriage, or, at least, is incorporated and consolidated into that of the husband, under whose wing, protection, and cover she performs every-thing; and is therefore called in our law-French, a *feme-covert, foe-mina viro co-operta;* is said to be *covert-baron,* or under the protec-tion and influence of her husband, her *baron* or lord; and her condi-tion during her marriage is called her coverture.    *    *    *    For this reason a man cannot grant anything to his wife, or enter into covenant with her, for the grant would be to suppose her separate existence; and to covenant with her would be only to covenant with himself." 1 Bl. Com. 442. "It is a well established maxim of the law, that hus-band and wife are one person.    For many purposes, this is a mere fig-ure of speech; for other purposes, it must be understood in its literal sense." LUSH, J., in *Phillips* v. *Barnet,* L. R. 1 Q. B. D. 436, 440.

By the common law, the married woman's contracts were absolutely void,—not merely voidable, like those of infants and lunatics; and this, not because of the theory that, like an infant or a lunatic, she required the protection of the law (for, in legal theory, a wife needed the protection of the law no more than a single woman), but because of the theory of the utter absorption of the existence of the wife in that of the husband; or the other theory, of her subjection and slavery. Both theories compelled the same practical result: her legal person-ality was extinguished, and her social personality was that of a slave, "under the rod." The social condition and legal status of woman was the natural condition of the age of feudalism which produced it—an age when every social relation was governed by feudal analogies. It is not surprising, therefore, that in such an age a theory of conjugal life should have gained ground in England which seemed to reproduce at every fireside the bond of lord and vassal, and to place the lord in the attitude of Petruchio :

> "I will be master of what is mine own :
> She is my goods, my chattels; she is my house,
> My household stuff, my field, my barn,
> My horse, my ox, my ass, my anything."

Kenny on Married Women's Property 8.

The wife being thus *sub potestate viri,* with the sanction of the law and of public opinion, the law was consistent in holding that "if a man beat an outlaw, a traitor, a pagan, his villein, or his wife, it is dispunishable, because, by the law common, these persons can have no action." BROOKE, J., 12 Hen. VIII, 4. And the woman being thus utterly within her husband's control, his chattel, his "ox," he became personally and solely answerable for her torts, as for the trespasses of his other domestic cattle; and, of course, the law could pursue no other consistent system than that which declared all her contracts absolutely void.

Such was the social and legal status of a married woman centuries ago; and the change of her condition before the law seems to be

much less in England than in New Hampshire. *Phillips* v. *Barnet*, before cited.

But feudalism exists no longer, and the social and legal conditions which the system produced have likewise passed away. The benign influences of Christianity, and a more diffused as well as a higher system of moral and intellectual education, have gradually ameliorated the hardships of woman's social condition, and have elevated her to the state of dignity and importance she possesses to-day—a social position of honor and respect. The change has been gradual, but it has been as marked as any other step in the course of advancing civilization, for it has been nothing less than a slow but steady march from slavery to freedom. It has been uniform in one respect: "Through all its course it has been distinguished by the gradual dissolution of family dependency, and the growth of individual obligation in its place." Maine's Ancient Law 163.

The movement has been "from *status* to *contract*." 18 Alb. Law J. 26. And if it be true, as maintained by Spencer, that in the United States "women have reached a higher status in the social structure than anywhere else" (1 Principles of Sociology 764), it is equally true that in many of the states, certainly in New Hampshire more than anywhere else, have the legal distinctions between the sexes been swept away.

The law of servitude in marriage is repealed in this state. In 1842 the Revised Statutes empowered a deserted wife to hold and convey property without the interference of her husband. Rev. St., *c.* 149, *s.* 1. Successive steps in the direction of a larger liberty and a corresponding responsibility, through the legislation of 1845 (Laws, *c.* 236), of 1846 (Laws, *c.* 327), of 1857 (Laws, *c.* 1960), of 1858 (Laws, *c.* 2073), of 1860 (Laws, *c.* 2342), of 1865 (Laws, *c.* 4080), of 1866 (Laws, *cc.* 4234, 4252), of 1867 (Gen. St., *c.* 164, *s.* 1), of 1869 (Laws, *c.* 35), of 1871 (Laws, *c.* 27), and perhaps other enactments not at this moment called to mind, resulted finally in the act of 1876 (Laws, *c.* 32). As the result of all this legislation, it is now settled that a wife may hold to her own use, free from the interference or control of her husband, all property at any time earned, acquired, or inherited by, bequeathed, given, or conveyed to her, either before or after marriage, and may make contracts, and may sue and be sued in all matters, whether in law or in equity, in the same manner as if she were sole and unmarried. Thus by progress in the same direction, by changes religious, social, customary, legislative, and judicial, the rule of the common law has been abolished and obliterated; and it is no longer possible to say that in New Hampshire a married woman is a household slave or chattel, or that in New Hampshire the conjugal unity is represented solely by the husband. By custom and by statute the wife is now joint master of the household, and not a slave or a servant. The rule now is, that her legal existence is not suspended. So practically has the ancient unity become dissevered and dissolved, that the wife may not only have her separate property,

contracts, credits, debts, wages, and causes of separate action growing out of a violation of her personal rights, but she may enter into legal contract with her husband and enforce it by suit against him. *Clough* v. *Russell*, 55 N. H. 279. And since the wife's property is no longer her husband's, nor her earnings his, by mere force of law, and since he has no more legal power of physical control over her than she has over him, no more reason seems to remain for holding him liable for her torts than for holding her liable for his. And there remains "not a reason, nor the semblance of a reason, growing out of the condition and wants of society, the progress of civilization, the exigencies of trade, or the analogies of the law," why the rules and forms adapted to a condition which has ceased to exist, and inapplicable to the conditions which have succeeded, should be longer retained. *Cessante ratione legis, cessat ipsa lex. Hammond* v. *Corbett*, 50 N. H. 501, 507; *Cole* v. *Lake Co.*, 54 N. H. 242, 279, 285.

Why, then, should the husband of Mrs. Harris be joined in this suit as a party plaintiff, any more than any stranger? None of his legal rights have been invaded by the act of Mrs. Webster; and, since his wife is entitled to hold to her separate use the fruits of the judgment that may be rendered in this action, he can have no right to or interest in the damages which may be recovered.

And why should the husband of Mrs. Webster be joined in this suit as a party defendant? He has done no wrong, and neither he nor his property can be holden for any damages or costs which may be recovered. We are unable to discover any reason why the husband of either party should be permitted to interfere in this controversy, except so far as to persuade his wife to cease litigation. Under recent statutes, antecedent to the law of 1876, it has been held that a husband could not properly be joined as plaintiff in a suit to recover his wife's earnings, nor in an action to recover a debt which accrued to his wife before marriage, nor in a writ of entry to recover possession of her land, nor in an action for trespass upon her estate; and, as we have seen, in matters pertaining to her own property, she may sue her husband and be sued by him. *Albin* v. *Lord*, 39 N. H. 196; *Bank* v. *Clark*, 46 N. H. 134; *Whidden* v. *Coleman*, 47 N. H. 297; *Cooper* v. *Alger*, 51 N. H. 172; *Alexanders* v. *Goodwin*, 54 N. H. 423; *Clough* v. *Russell*, 55 N. H. 279; *Cahoon* v. *Coe*, 57 N. H. 556. The statute of 1876 is so broad and sweeping in its terms as to preclude the supposition that it could have had reference to matters of contract only.

We are therefore of the opinion, that, as at common law, so no less under the operation of the statute, the rule of pleading must prevail, which requires that an action at law must be brought in the name of the party whose legal right has been affected, against the party who committed or caused the injury (1 Chitty Pl. 1; Dicey on Parties 380–382); that the husbands of these female parties are strangers, in law, to this proceeding, and that the demurrer should be sustained.

*Case discharged.*

CLARK, J., did not sit.